2006 ME 113

**QUILAND, INC., et al.**

v.

**WELLS SANITARY DISTRICT.**

Supreme Judicial Court of Maine.

Argued: May 9, 2006.

Decided: Sept. 12, 2006.

James T. Kilbreth (orally), Jacqueline W. Rider, Verrill Dana, L.L.P., Portland, for plaintiff.

Paul L. Beach (orally), Kimmel & Beach, Kennebunk, for defendant.

Panel: SAUFLEY, C.J., CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

ALEXANDER, J.

[¶ 1] Quiland, Inc., and Summer Village Condominium Association[1] (Quiland) appeal from a judgment entered in the Superior Court (York County, *Fritzsche, J.*) affirming the Wells Sanitary District's (District) determinations that the seasonal cottages at Summer Village will be deemed residences for purposes of assessing usage and impact fees, and that the cottages will be billed individually rather than as a group. Quiland argues that the District abused its discretion in making the above determinations, and violated Quiland's constitutional equal protection rights by the fee determinations and the individual bill-

---

1. Summer Village Condominium Association was joined as a plaintiff, but has no separate issues on appeal.

ing. Finding no constitutional or statutory violations demonstrated in this record, we affirm the judgment.

## I. CASE HISTORY

[¶ 2] Quiland owns a sixty-one-acre property in Wells on which it is developing a complex of 247 separate seasonal cottages, to be known as Summer Village. The cottages will be offered for sale as individual condominium units. They will have no more than 600 square feet of living space, with additional porch space of no more than 160 square feet. They will have one or two bedrooms, one bath, washer and dryer hook-ups, and an open living area. The complex will be closed from November 1 to April 30. During that time, the water service to the cottages will be turned off.

[¶ 3] Summer Village will be managed by the Summer Village Condominium Association, which is controlled by Quiland. When seventy-five percent of the cottages are sold, control will transition from a Quiland-appointed board of directors to an owner-appointed board.

[¶ 4] The Town of Wells Planning Board granted site plan approval for Summer Village on September 27, 2004.

[¶ 5] The Wells Sanitary District must construct a 1235–foot extension along a public road to connect sewer and water service to the Quiland development. From late 2003 forward, Quiland and District representatives had ongoing discussions regarding design, development, and payment of fees relating to the anticipated development. Initially the cottages were planned as two-bedroom units with separate water meters to be sold as individual condominium units. Later, the plans changed to have some one-bedroom and some two-bedroom units, and to have a single water meter for the entire development.

[¶ 6] There were several communications between representatives of Quiland and the District regarding assessment of impact and usage fees and billing practices to be applied to the cottages. It appears that the District's staff initially determined that the cottages would be individually billed for service, that they would be categorized as "residences," and that impact fees and assessments would be based on a design flow of 250 gallons-per-day for two-bedroom units and 150 gallons-per-day for one-bedroom units.

[¶ 7] One of the developers wrote to the District asking that the District Board reconsider the assessment determination. The letter stated that the classification and assessment "seems out of line with the classifications for other seasonal/recreational facilities in the Town of Wells." The letter then suggested that the District look to the State plumbing code and use "a category for campground/park model sites which is 125 gal./day," or "a category called rental cabins (housekeeping) which shows 50 gal./day per cabin, plus 50 gal./bed." The letter observed that:

> I don't know yet which category we ought to fall into, but I think we clearly do not fall into the category of a 2–bedroom house, since there are a number of uses that would never occur in these cottages but do occur in a house. A typical 2–bedroom house in the Town of Wells would be 1000 to 1200 square feet-our cottages are only 600 square feet.

[¶ 8] A subsequent letter asked that the development be treated as one lot with 247 users, that design flow be 125 gallons-per-day, per cottage, and that charges and flows be assessed as in other multi-unit campgrounds or RV parks.

[¶ 9] The Board of Trustees of the District met to consider Quiland's request on December 28, 2004. The minutes of the

Board meeting indicate that a different representative of Quiland argued that the Quiland cottages should be considered in the same category as a "park model" in a campground with a design usage of 115 to 150 gallons-per-day. After noting that impact fees and design flows would have to accommodate flows on a peak summer day, the Board approved treating the Quiland cottages as residences and using a design flow of 250 gallons-per-day to calculate the impact fee for a two-bedroom cottage. The impact fee and the assessment would be adjusted, dependent upon the number of one-bedroom and two-bedroom units to be constructed.

[¶ 10] Quiland appealed the Board's decision to the Superior Court pursuant to M.R. Civ. P. 80B. In support of the appeal, Quiland and the District presented a stipulated record to the Superior Court, M.R. Civ. P. 80B(e). That record included relevant District and Planning Board minutes from 2004, Quiland communications to the District, plus the relevant land use ordinances and rate structure documents.

[¶ 11] Separately, both parties presented to the Superior Court affidavits that were not part of the record before the District. These affidavits attempted to compare the Quiland development with other multi-unit developments in Wells in support of, or opposition to, Quiland's argument to the Superior Court that the development was being subject to disparate treatment when compared to other developments or parks that were similarly situated.

[¶ 12] From these materials, it is difficult to determine whether other units that Quiland asserts are comparable to its units, are actually similar to, or smaller than, the 600–square–foot size of the Quiland units. It is also difficult to tell whether other units are equipped with washing machines and dryers and whether the other parks are planned to be unit-owner controlled, like Quiland's, or will remain landlord controlled.

[¶ 13] In its appeal to the Superior Court, and its appeal to us, Quiland argued that the District (1) violated its own policies in failing to utilize the Maine State plumbing code to determine design flows for structures not specifically identified in the District's own utilization report; (2) erred in characterizing the Quiland structures as "residences" when the Wells Planning Board approval had determined that the structures were "seasonal cottages"; (3) should have accepted the gallons-per-day usage estimates provided by Quiland's engineers in their communications with the District; and (4) violated Quiland's constitutional right to equal protection by treating its structures as residences rather than seasonal cottages, resulting in disparate treatment compared to other structures in multi-unit developments in Wells that, Quiland asserts, were similar to the Quiland structures.

[¶ 14] After hearing, the Superior Court determined that the District was not governed by the determinations of the Planning Board regarding the nature of the structures because it was subject to a separate ordinance that only required the District to coordinate its activities and requirements with development activities subject to the zoning ordinance. The court also determined that there was no equal protection violation, and that the treatment of the cottages as residences was appropriate and "consistent with the reason for having an impact fee" because the Quiland structures could have multiple occupants who could put a demand on the District treatment facilities similar to that of "any other residence on a peak day in the summer." The court also affirmed the District's decision to separately bill the individual structures, finding the decision consistent with both the District's policy

that billings be based on ownership and Quiland's plan that, ultimately, the cottages would be separately and individually owned. Thus, the Superior Court affirmed the impact fee and billing practices for the Quiland development that had been approved by the District's Board of Trustees. Quiland then brought this appeal.

## II. LEGAL ANALYSIS

### A. Standard of Review

[¶ 15] On an appeal pursuant to M.R. Civ. P. 80B, when the Superior Court acts in an intermediate appellate capacity, we review directly the decision of the local administrative agency. *Peregrine Developers, LLC v. Town of Orono*, 2004 ME 95, ¶ 9, 854 A.2d 216, 219. In that review, we examine the record before the administrative agency to determine if the agency exceeded the bounds of its discretion, committed errors of law, or made findings that are not supported by substantial evidence contained in the record before the administrative agency. *Tinsman v. Town of Falmouth*, 2004 ME 2, ¶ 8, 840 A.2d 100, 103. Here the parties presented a stipulated record of the administrative proceeding, M.R. Civ. P. 80B(e), supplemented by new materials presented, without objection, to the Superior Court.

[¶ 16] A party asserting error in an administrative agency's findings or determinations has the burden of demonstrating that error to us. *Zegel v. Bd. of Soc. Worker Licensure*, 2004 ME 31, ¶ 14, 843 A.2d 18, 22 (stating that parties seeking to vacate an agency decision bear the burden of persuasion on appeal). When, as here, an appellant had the burden of proof on an issue, such as a claim of violation of equal protection rights, the appellant cannot prevail unless the appellant demonstrates that the record that was before the agency, and the court below, com-

pels the contrary findings that the appellant asserts should have been entered. *See Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 8, 870 A.2d 566, 569; *Phaiah v. Town of Fayette*, 2005 ME 20, ¶ 9, 866 A.2d 863, 866. Further, in examining impact fee differences, there is no violation of equal protection as long as there is a reasonable basis to conclude that the fees, although different for different entities, are rationally related to the objective of the regulation and are not arbitrary or unreasonable. *See Downey v. Wells Sanitary Dist.*, 561 A.2d 174, 176 (Me.1989).

### B. Application of the Standards of Review to this Case

#### 1. Equal Protection Claim

[¶ 17] Quiland contends that its development of stick-built homes is similar to multiple-unit developments utilizing camper trailers or park model trailers, and that the District's failure to treat the Quiland development identically for fee assessment purposes amounts to disparate treatment of entities similarly situated, in violation of the equal protection clause of the United States Constitution.

[¶ 18] The Superior Court found that, on the record before it, Quiland's equal protection claim was not proven. Thus, to prevail on appeal, Quiland must demonstrate that the record compels the contrary conclusion that it has met its burden to prove the equal protection claim. In support of its equal protection claim, Quiland urges that its units are assessed differently and at a higher rate than would be the case if the units were assessed pursuant to the State plumbing code, and that the units should be assessed on the same basis as park model trailers. Quiland also asserts that its equal protection rights are violated by assessing the units individually, rather than utilizing one meter, or one assessment for the entire development.

These equal protection claims are addressed in our discussion of Quiland's statutory claims.

2. Statutory Claims

■ [¶ 19] Separate from the equal protection claims, Quiland asserts that its structures should be treated in the same manner as either campgrounds or rental cabins are treated under the State plumbing code. As Quiland asserted in its letter to the District, the State plumbing code, 16 C.M.R. 10 144 241–24 to –25, Table 501.2 (2006), indicates that "rental cabins, housekeeping" have a design flow of fifty gallons-per-day per cabin plus fifty gallons-per-day per bed. For a two-bedroom cabin with two twin beds in each bedroom, application of the State plumbing code would result in the identical 250–gallons–per–day standard applied by the Board to the Quiland development. If the open living area of the two-bedroom units also contained or might contain an additional bed or convertible couch, it is possible that application of the State plumbing code would result in a higher gallons-per-day design standard than applied by the District. The District's use of the two-bedroom residence standard does not indicate any error. That standard, for all practical purposes, is no different than the standard advocated by Quiland under the State plumbing code.

■ [¶ 20] Quiland also argues that the District did not have sufficient evidence to classify the Summer Village cottages as residences because the Wells Land Use Ordinance has separate categories for dwellings and seasonal cottages, and has a specific definition and requirements for seasonal cottages. Quiland further argues that the District has a statutory obligation,

under 38 M.R.S. § 1163–A (2005), to cooperate with the Town of Wells in its land use plans, and that this cooperation includes defining and treating structures in the same way.

[¶ 21] There are several reasons why Quiland has failed to demonstrate that the District's treatment of its structures as residences violated either Wells ordinances or section 1163–A. The cottages are stick-built and on a permanent foundation, not like recreation vehicles or mobile homes that can be attached to a truck and moved away. They are larger than camper trailers or park model trailers.[2] The cottages are advertised as being residence-like: they are "climate controlled living spaces, plus an additional 160 square feet [consisting of a] three-season porch area"; the "homes are for use and enjoyment from May to October"; and the cottages contain "[f]ully [a]pplianced [k]itchens including garbage disposal and GE refrigerator, range, microwave, and dishwasher."

[¶ 22] The purpose of the District is to provide sewer service for the Town of Wells during all times of the year, which means, importantly, providing sufficient service during July and August. The District is required to be prepared to handle any amount of wastewater that could be generated by the cottages, and because of the potential for very high use in the peak months of the summer, there is sufficient evidence to classify the cottages as residences. *See Downey*, 561 A.2d at 176.

■ [¶ 23] Title 38 M.R.S. § 1163–A, imposes no mandate that the District, in making determinations of impact fees or assessments, use the exact same verbiage as municipalities in their land use ordinances and plans. Section 1163–A states:

**2.** The maximum size trailer permitted on a public way by state law is 8.5 feet by 48 feet, *see* 29–A M.R.S. §§ 2380(3) (width limit),

2390(1)(c) (length limit) (2005). A maximum size trailer would cover 408 square feet.

**1. Sanitary Districts.** The trustees of a sanitary district shall cooperate with municipal officials in the development of municipal growth management and other land use plans and ordinances; and

**2. Municipalities.** Municipal officers shall cooperate with the trustees of a sanitary district during the consideration of development applications that may affect the operations of the district.

Although mandating "cooperation," the statute does not require the District to follow the Town's interpretation of specific definitions in the ordinances. The most that can be gleaned from the legislative history of this section is that "cooperation" is an aspirational goal, that "[t]his [statute] would merely get service providers and municipalities talking to each other, with the result, hopefully, of better coordination of decision making."[3] Land Use Regulatory Reform Committee, Integrating Land Use and Natural Resource Management:

Final Report to the 116th Legislature 22 (Jan. 1994).

[¶ 24] Finally, Quiland argues that the District abused its discretion or violated Quiland's equal protection rights in determining that Summer Village homes should be individually billed for sewer use as multiple users rather than as a single user.

[¶ 25] The evidence in the record indicates that the District's sewer user rate system is distributed among the users, regardless of whether or not they are seasonal or year-round users. The District bases the water usage on a reasonable estimation based on what information is available. Furthermore, the District based its separate treatment of the Summer Village units on the Maine Condominium Act, which states that condominiums must be treated as separate parcels for all purposes.[4] The Summer Village units are

---

**3.** Title 38 M.R.S. § 1163–A (2005) was a small portion of legislation entitled "An Act to Improve Environmental Protection and Support Economic Development under the State's Land Use Laws." P.L. 1993, c. 721 (effective Oct. 1, 1994); L.D. 1487 (116th Legis. 1993). In the January 1994 Final Report of the Land Use Regulatory Reform Committee, the findings and recommendations portion stated:

> Upon investigation of the statutory basis for municipal authority over sewer and water line extension, the committee found that, while not sufficiently clear, present law requires that sewer and water districts comply with the requirements of local zoning.... The committee thus finds that a clarification of existing law is warranted to encourage better cooperation among municipal governments and these service districts as early as possible in the local planning process.
>
> ....
>
> ... With regard to fostering early cooperation between towns and service districts during the planning process, the committee recommends that the Legislature enact a provision that explicitly states that water

and sewer districts shall cooperate in municipal plan development. This would merely get service providers and municipalities talking to each other, with the result, hopefully, of better coordination of decision making.

Land Use Regulatory Reform Committee, Integrating Land Use and Natural Resource Management: Final Report to the 116th Legislature 21–22 (Jan. 1994).

**4.** Title 33 M.R.S. § 1601–105 (2005) of the Maine Condominium Act states:

> **(a)** If there is any unit owner other than a declarant, each unit which has been created, together with its appurtenant interests, constitutes for all purposes a separate parcel of real estate.
>
> **(b)** If there is any unit owner other than a declarant, each unit shall be separately taxed and assessed and no separate tax or assessment may be rendered against any common elements for which a declarant has reserved no development rights.
>
> **(c)** Any portion of the common elements for which the declarant has reserved any development right to add real estate to a condominium or to withdraw real estate

being sold as condominiums. Thus, there is sufficient evidence in the record, and a rational basis, for the District to bill the units separately.

The entry is:

Judgment affirmed.

from a condominium, shall be separately taxed and assessed against the declarant, and the declarant alone is liable for payment of those taxes.

**(d)** If there is no unit owner other than a declarant, the real estate comprising the condominium may be taxed and assessed in any manner provided by law.